E-FILED
Monday, 24 May, 2010 03:51:31 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| DONNA KAY BALES, *Independent Executor of the Estate of Jack A. Bales, deceased*, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 08-cv-1106 |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT & CONCLUSIONS OF LAW

On December 14, 2009, this Court held a one-day bench trial in this Federal Tort Claims Act case. As directed by the Court, the parties submitted trial briefs prior to trial, and proposed Findings of Fact & Conclusions of Law following the trial. (Docs. 21, 22, 26, 27). The Court now makes its Findings of Fact & Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a). To the extent that any of the findings of fact as stated may be deemed to be conclusions of law, they may also be considered conclusions of law. If any matters expressed as conclusions of law may be deemed findings of fact, they may also be considered findings of fact. Any facts not expressly stated in the below findings are either immaterial or undisputed.

### FACTUAL SUMMARY & OVERVIEW OF ARGUMENTS

The Court will examine the facts and the parties' arguments in greater detail below, but provides an overview in order to establish a conceptual framework. On April 30, 2007, at approximately 11:20 A.M., Jack Bales was traveling eastbound on

1900 North Road in Anchor, Illinois, on a riding lawnmower. Kenneth Hilgemann, a rural postal carrier, was also traveling northbound on 1900 North Road at this time, driving between mailboxes on his rural mail-delivery route; he was driving a 1997 Buick LeSabre car. The front right side of Mr. Hilgemann's car struck the left rear of the lawn mower, and Mr. Bales died on May 1, 2007 from injuries that he sustained in the crash. Mr. Bales is survived by his wife, Mildred Louise Bales, and two children Donna Kay Bales and Randy Bales.

Donna Bales has been appointed independent executor of Mr. Bales' estate, and has brought suit under the Federal Tort Claims Act ("FTCA"), as Mr. Hilgemann was acting in the scope of his employment by the United States Postal Service ("USPS") at the time of the crash.[1] Under the FTCA, this action is governed by Illinois substantive law, in particular the Wrongful Death Act. There are no contested issues of law. The parties have stipulated that the United States is more that 50% liable for Mrs. Bales' loss of society and loss of services, Donna Bales' loss of society and loss of services, Randy Bales' loss of society and loss of serices, and certain medical expenses.[2] The disputed issues are the amount of damages necessary to reasonably and fairly compensate Mrs. Bales, Donna, and Randy, and the percentage of negligence by Mr. Bales, if any, that contributed to causing the accident.

---

[1] Plaintiff presented a claim to the USPS on October 16, 2007, pursuant to 28 U.S.C. § 2675(a); the USPS did not make a final disposition within six months, so this court has federal jurisdiction pursuant to the FTCA, 28 U.S.C. §§ 2674, 1346(b)(1).

[2] The parties consented in the Final Pretrial Order to trial of Plaintiff's claimed medical expenses, though the claim was not raised in the Complaint. (Doc. 13 at 5). In addition, Plaintiff waived her Survival Act claim. (Doc. 13 at 4).

Plaintiff claims that Mrs. Bales is entitled to $2,000,000 for loss of Mr. Bales' society, that Donna and Randy are each entitled to $635,250 for loss of Mr. Bales' society, and that the estate is entitled to $64,943.39 in medical expenses. (Doc. 27 at 25). Plaintiff denies that any negligence by Mr. Bales contributed to causing the accident. Defendant asserts that Mr. Bales' negligence contributed 20% to causing the accident, and that, after such reduction, Mrs. Bales is entitled to $360,000, Donna and Randy are each entitled to $108,000, and the estate is entitled to $51,954.71 in medical expenses.[3] (Doc. 26 at 35-36).

**SUMMARY OF BENCH TRIAL PROCEDURE**

At the bench trial on December 14, 2009, Plaintiff was represented by attorneys Michael Teich and Joshua Weisberg, while Defendant was represented by Assistant U.S. Attorney Gerard Brost. Plaintiff offered the testimony of Mr. Hilgemann via video deposition;[4] James Linane, an accident-reconstruction expert;[5] Roy Hill, Mr. Bales' former pastor; and Randy, Mrs. Bales, and Donna. Defendant offered no witnesses. Plaintiff also offered a number of exhibits, including

---

[3] Prior to the 20% contributory negligence reduction, these amounts would be $450,000, $135,000, and $64,943.39, respectively.

[4] Mr. Hilgemann suffers from health problems that have removed his ability to speak, and have impaired his vision and hearing. Therefore, the parties agreed that at least some portions of a video deposition of Mr. Hilgemann would be used at trial. In response to Plaintiff's designation of certain portions of Mr. Hilgemann's deposition for use at trial, Defendant moved to have the entire deposition viewed during the trial. The Court granted Defendant's request, allowing the parties to object to the admission of the testimony during the viewing of the video, if necessary. (Doc. 23). The deposition transcript was admitted at trial as Exhibit 25.

[5] No *Daubert* objection was made to Mr. Linane's designation as an expert.

photographs of the crash site taken by police; photographs of the crash site taken by Mr. Linane, photos and a video of Mr. Bales, and medical records and bills.

The Court has reviewed the arguments of counsel, the testimony of the witnesses, the depositions of the absent witnesses, the exhibits received into evidence, the trial transcript, and detailed notes taken by the Court at trial. The Court has taken care to appraise each witness's credibility and to determine the weight to be accorded his or her testimony. In so doing, the Court considered the witnesses' intelligence, ability, and opportunity to observe; their age, memory, and manner while testifying; any interest, bias, or prejudice they may have had; and the reasonableness of their testimony in light of all the evidence presented in the case. The Court recorded its impressions of the witnesses in its notes. In reaching its conclusion in this case, the Court has sought to draw reasonable inferences from the evidence, and has considered the parties' legal arguments.

## CONCLUSIONS OF LAW

### I. General

1. At all relevant times Kenneth Hilgemann was acting within the course and scope of his federal employment with the United States of America as a mail carrier. (Doc. 13, Ex. A at ¶ 21).

2. The United States of America is liable for the negligent acts and/or omissions of federal employees acting in the course and scope of their federal employment. (Doc. 13, Ex. A at ¶ 32).

3. Under the FTCA, this action is governed by Illinois substantive law. Illinois' Wrongful Death Act and other substantive law control this matter. (Doc. 13, Ex. A at ¶ 29).

**II. Damages**

4. Under 28 U.S.C. § 2675(b), damages are limited to the demand made to the United States Postal Service, which was in the amount of $9,500,000. (Doc. 13, Ex. A at ¶ 33).

5. The parties agreed to trial on Plaintiff's claim to Mr. Bales' medical expenses. (Doc. 13 at 5).

6. Medical expenses incurred by Mr. Bales from the accident total $64,943.39, and are uncontested. (Doc. 13, Ex. G; Doc. 22 at 4).

7. Under Illinois' Wrongful Death Act, surviving spouses and next of kin can recover for their loss of the society and services of the decedent.[6] ILL. PATTERN JURY INSTR. CIV. 31.04 & 31.11 (2009 ed.).

8. In FTCA cases, district courts are to "consider[] awards in similar cases, both in Illinois and elsewhere" in determining the appropriate measure of damges. *Arpin v. U.S.*, 521 F.3d 769, 776 (7th Cir. 2008).

9. The Court agrees with Plaintiff that settlement figures are inappropriate comparative measures of damages, as they represent the parties' calculations based on the risks and costs of trial, rather than an impartial determination of the proper amount of damages. *See Hardnick v. United States*, 2009 WL 1810106, *14 (N.D.

---

6 Beginning May 31, 2007, survivors could recover for their grief, sorrow, and mental suffering. ILL. PATTERN JURY INSTR. CIV. 31.04 (2009 ed.). As the accident here took place on April 30, 2007, and Mr. Bales died on May 1, 2007, this amendment is not applicable.

Ill. 2009) (*quoting Kasongo v. United States*, 523 F.Supp.2d 759, 804 fn. 39 (N.D. Ill. 2007)).

## III. Contributory Negligence

10. The total damages resulting from the death of Jack Bales shall be reduced by the percentage of negligence, if any, attributable to Jack Bales, under the Illinois Wrongful Death Act and 735 ILCS 5/2-1116. (Doc. 13, Ex. A at ¶ 36).

11. "A plaintiff is contributorily negligent when he or she acts without the degree of care that a reasonably prudent person would have used for his or her own safety under like circumstances and that action is the proximate cause of his or her injuries." *See, e.g., Coole v. Central Area Recycling*, 893 N.E.2d 303, *396 (Ill. App. 2008) (*citing Basham v. Hunt*, 773 N.E.2d 1213, 1226 (Ill. App. 2002)).

12. Violation of "a statute designed for the protection of human life and property…is prima facie evidence of negligence." *Lindquist v. Chicago and Northwestern Transp. Co.*, 722 N.E.2d 270, 276 (Ill. App. 1999) (*citing Hamilton v. Atchison, Topeka & Santa Fe Ry. Co.*, 530 N.E.2d 268, 269 (Ill. App. 1988)).

# FINDINGS OF FACT

## I. Background Facts

13. Jack Bales died on May 1, 2007 as a result of the injuries he sustained in the April 30, 2007 crash. (Doc. 13, Ex. A at ¶ 34).

14. On October 2, 2007, the probate court in McClean County, Illinois, issued an order to Donna Bales appointing her to serve as the independent executor of the estate of Jack A. Bales. (Doc. 13, Ex. A at ¶ 38).

15. The United States of America has admitted it that its employee, Kenneth Hilgemann, was negligent and that is more than 50% liable for the following elements of damages: Mildred Bales' loss of society and loss of services; Randy Bales' loss of society and loss of services; Donna Bales' loss of society and loss of services; and medical expenses itemized in Exhibit G. (Doc. 13, Ex. A at ¶ 39).

## II. Facts Relating to Damages

16. Mr. Bales was 76 years old at the time of his death. (Doc. 13, Ex. A at ¶ 36).

17. Mr. Bales' statistical life expectancy at the time of his death was 10.2 years. (Doc. 13, Ex. A at ¶ 37).

18. Prior to Mr. Bales' death, he incurred $64,943.39 in medical expenses due to the accident. (Doc. 13, Ex. G; Tr. Exs. 6, 8, 10, 11).

19. Mr. Bales married Mildred Louise Bales in 1952. (Doc. 13, Ex. A at ¶ 1).

20. Mr. and Mrs. Bales have two children, Donna Kay Bales born in 1955 and Randy Bales born in 1962. (Doc. 13, Ex. A at ¶ 2).

21. Mr. Bales worked for General Motors for 34 years until his retirement in 1987. (Doc. 13, Ex. A at ¶ 3).

22. Mr. and Mrs. Bales lived in Lockport, Illinois for about 40 years until 1993, when they moved to Anchor, Illinois. (Doc. 13, Ex. A at ¶ 4).

23. They moved to Anchor to be near their son Randy and his family. (Doc. 13, Ex. A at ¶ 5).

24. Their daughter Donna moved next door to the Bales' home with her daughter and granddaughter in 2002. Donna and her family have lived next door to Mr. and Mrs. Bales' home since then. (Doc. 13, Ex. A at ¶ 6).

25. Mr. Bales had three grandchildren and one great-granddaughter living within two miles of his home. He was very close with his grandchildren and great-granddaughter. He saw his grandchildren and great-granddaughter every day. (Doc. 13, Ex. A at ¶ 7).

26. Mr. Bales loved to babysit his grandchildren and great-granddaughter and did so often. (Doc. 13, Ex. A at ¶ 8).

27. Mr. Bales loved fishing and spent as much time as he could fishing. (Doc. 13, Ex. A at ¶ 9).

28. Mr. Bales was a big sports fan. He went to every local high school football game and he enjoyed listening to Cubs games on the radio. (Doc. 13, Ex. A at ¶ 11).

29. Mr. and Mrs. Bales enjoyed travelling together. During the last five years of his life they travelled to Hawaii and Tennessee, among other places. (Doc. 13, Ex. A at ¶ 12).

30. Mr. Bales loved gardening and yard work. He spent much of his time working in the yard at his home and at Randy's and Donna's homes. (Doc. 13, Ex. A at ¶ 10).

31. Mr. Bales enjoyed mowing the grass. He mowed the grass at his home and at Randy's and Donna's homes for about five years before he died. (Doc. 13, Ex. A at ¶ 3).

32. Mr. Bales was handy around the house. When he and Mrs. Bales bought their home he spent five or six months gutting and rehabilitating the entire house. He continued working and fixing things around the house until he died. (Doc. 13, Ex. A at ¶ 14).

33. Mr. Bales had many friends. Over 400 people attended his funeral. (Doc. 13, Ex. A at ¶ 35).

34. Mrs. Bales, Donna, and Randy all testified that Mr. Bales was exceptionally supportive of his wife, and that she had relied heavily on him.

35. Roy Hill testified that Mr. Bales loved his wife and children, and was very close with them, but that Mr. Bales was not different from other good husbands and fathers, and that the family had the normal ups and downs.

36. Mrs. Bales, Donna, and Randy all testified as to Mr. Bales' relationship with Donna. The Court finds that Donna had a close relationship with her father, and he helped her a great deal by assisting with the renovation and maintenance of her home.

37. Mrs. Bales, Donna, and Randy all testified as to Mr. Bales' relationship with Randy. The Court finds that Randy had a close relationship with his father, and his death has affected Randy's life greatly.

38. The parties submitted trial briefs and proposed Findings of Fact and Conclusions of Law, in which they each cited to cases they argue are appropriate for a damages comparison. Plaintiff cites to *Sheehan v. United States*, 2003 WL 21938610 (N.D. Ill. 2003); *Clarke v. Medley Moving and Storage*, 885 N.E.2d 396 (Ill. App. 2008); *Barry v. Owens-Corning Fiberglass*, 668 N.E.2d 8 (Ill. App. 1996); *Lifonti v. Wedgewood Nursing Pavillion*, 2005 WL 2822606 (Ill. Cir. 2005) (verdict

and settlement summary at 2005 WL 2386064); *Lecat v. Pitter*, 2003 WL 22024054; *Russell v. Bethesda Lutheran Home*, 2002 WL 430538.[7]

39. In *Sheehan*, an FTCA case, the court, after consideration of comparative awards, awarded the 62-year-old decedent's wife $2,025,000 for loss of society and loss of consortium, and each of his four adult children $150,000 for loss of society.[8] In *Clarke*, the 83-year-old decedent's four adult children, who had a very close relationship with their father, were awarded $362,500 per child. The *Barry* court upheld a jury verdict of $3,000,000 to the 59-year-old decedent's wife, and an average of $550,000 to each of his seven children. The *Lifonti* jury awarded the 84-year-old decedent's adult child $1,200,000 for loss of society. In *Lecat*, the jury awarded each of the 69-year-old decedent's four children $1,000,000.[9] The jury in *Russell v. Bethesda Lutheran Home* awarded the 62-year-old decedent's wife $2,100,000 for her loss of her husband's society and services, and each of his five adult children $150,000 for their loss of his society and services.

40. Defendant cites to many cases, but those the Court finds potentially relevant are: *Estate of Davis v. Cooper, et al.*, 2007 WL 4823919 (2007); *Wright v. Purdy*

---

[7] Plaintiff also cites to *Christo v. Heilig Meyers Co.*, Cook County Verdict Reporter 99-L-8771, but did not include a copy of the verdict report with her brief. The Court has not been able to obtain a copy of this verdict report, and so will not consider this award.

In addition, Plaintiff cites to *Arpin v. United States*, 2009 WL 3816844, (S.D. Ill. 2009) and *Cason v. Holmes Transport*, 2009 WL 4730959 (S.D. Ill. 2009). As both of these cases involved decedents in their mid-50s, more than 20 years younger than Mr. Bales, the Court does not consider these to be proper comparative cases.

[8] These awards were reduced by 20% for the decendent's contributory negligence.

[9] This award was reduced by 20% for decedent's contributory negligence.

*Brothers Trucking*, 2005 WL 4041207 (2005); *Jablonski v. Ford Motor Co.*, 2005 WL 3018414 (2005) (judgment at 2005 WL 2837524, appeal at *Jablonski v. Ford Motor Co.*, 923 N.E.2d 347 (Ill. App. 2010)).[10]

41. The *Davis* jury awarded the 78-year-old decedent's five adult children $40,000 each.[11] The *Wright* jury awarded the 72-year-old decedent's spouse and eight adult children $2,700,000, an award of $300,000 each if divided equally.[12] In *Jablonksi*, the jury awarded $3,500,000 to the decedent's next-of-kin for loss of society; the decedent was married and had four children, so this would work out to an award of $700,000 each if divided equally.[13]

42. These cases reveal a range of awards to surviving spouses and children for loss of society claims. The range of awards to children is $40,000 to $1,200,000 for each child, and the range of awards to spouses runs up to $3,000,000, though the

---

10 The Court, as noted above, does not consider settlement amounts, and also does not consider the cited cases involving much-younger decedents. The *Maher v. Illinois State Toll Hwy. Auth.* case is eliminated, as it involved the estate of a nun, who presumeably had no spouse or children; the *Petraski v. County of Cook* case is also eliminated, as the accident at issue did not result in death.

11 This award was reduced by 49% for the decedent's comparative negligence.

12 The verdict report of this award does not distinguish between the awards for the spouse and the children, though it does note that only the spouse claimed loss of services. The jury also awarded $1,000,000 in pain and suffering for the decedent's survival claim and $503,743 in medical expenses.

13 There were significant damages awarded in this case for the decedent's survival claims, as well as for his wife's pain and suffering, medical expenses, future necessary help, disability, and disfigurement, as she was a fellow victim of the car accident. Punitive damages were also awarded.

*Wright* and *Jablonski* verdict reports do not specifically indicate how the awards were distributed between the spouses and children.[14]

43. The Court awards $1,750,000 to Mrs. Bales for her loss of Mr. Bales' society and services. This is higher than the apparent awards in *Wright* and *Jablonski*, in light of Mrs. Bales' heavy dependence on Mr. Bales. On the other hand, this award is lower than those in *Sheehan*, *Russell*, and *Barry*, to account for the fact that Mr. Bales was significantly older and had a shorter life expectancy than the decedents in those cases.

44. The Court awards $500,000 each to Donna and Randy for their losses of Mr. Bales' society and services. This is the approximate average of the awards to each child from the cited cases, and is close to the awards in the *Clarke* and *Barry* cases. The *Clarke* court specifically noted that the decedent, like Mr. Bales, had a very close relationship with his children, but awarded only $362,500 to each of them. The Court takes into account the fact that the *Clarke* decedent was 8 years older than Mr. Bales at the time of his death, and so finds that a higher award to Mrs. Bales is appropriate.

---

[14] Defendant also argues that *Wright* and *Jablonski* should not be consided, as the *Wright* decedent survived for 55 days and had eight children, while the *Jablonski* case involved punitive damages, survival claims, and products liability claims. Though the Court has attempted to control for the differences between *Wright* and the instant case by not considering the survival claim damages and by dividing the damages between the eight children, the available verdict report is less helpful as a comparison where it does not specify what damages were included in the "other" damages of $2,700,000. Similarly, in *Jablonski*, the Court has separated out the loss of society damages from the many others present in the case, but the case remains less helpful in that it includes so many different claims from those presented in the instant case.

## III. Facts Relating to Contributory Negligence

45. On April 30, 2007 at approximately 11:20 am Jack Bales was involved in a motor vehicle crash. (Doc. 13, Ex. A at ¶ 15).

46. At the time of the crash Jack Bales was driving eastbound on 1900 North Road near 3700 East Road in Anchor, Illinois. (Doc. 13, Ex. A at ¶ 16).

47. At the time of the crash Jack Bales was driving his son Randy's Exmark Explorer riding lawn tractor. He had just finished mowing Randy's lawn and was driving the lawn tractor to his home. (Doc. 13, Ex. A at ¶ 17).

48. The maximum speed of the lawn tractor was approximately 6.6 miles per hour. (Doc. 13, Ex. A at ¶ 18).

49. Just prior to and at the time of the crash Kenneth Hilgemann was driving eastbound on 1900 North Road behind Mr. Bales and was approaching Mr. Bales from the rear. (Doc. 13, Ex. A at ¶ 20).

50. The front right side of Mr. Hilgemann's car struck the left rear of the lawn mower. (Doc. 13, Ex. A at ¶ 23).

51. Mr. Hilgemann's last delivery before the crash was to a mailbox at 36545 E. 1900 Road. He travelled eastbound in a straight line approximately 1,100 feet from that mailbox to the crash location. (Doc. 13, Ex. A at ¶ 25).

52. James Linane testified as Plaintiff's expert witness in accident reconstruction. (Tr. 20).

53. Mr. Linane, who had worked for police departments in Illinois from 1972 until his recent retirement, has been an accident investigator for 37 years. (Tr. 18).

54. During the 1,100 feet of travel from the last mailbox to the crash location there were no obstructions to prevent Mr. Hilgemann from seeing Mr. Bales' vehicle. (Doc. 13, Ex. A at ¶ 26).

55. Mr. Linane testified that, because there were many variables to consider, he could only determine a range of speeds at which Mr. Hilgemann was traveling before the accident, between 30 and 50 miles per hour. (Tr. 30, 34-35, 129-30).

56. At the range of speeds calculated by Mr. Linane, it would have taken at least 15 to 25 seconds to travel between the last mailbox and the point of impact. (Tr. 63-64).

57. As he drove eastbound from the mailbox to the crash location, Mr. Hilgemann was not sitting in the driver's seat. In order to be able to reach through the passenger side window to deliver mail he was sitting in the middle of his vehicle's bench seat between the driver's seat and the passenger's seat. He held the steering wheel with his left hand and operated the accelerator with his right foot and the brake with his left foot. (Doc. 13, Ex. A at ¶ 27).

58. Mr. Hilgemann testified that he was watching the road, but cannot explain why he did not see Mr. Bales' vehicle in time to avoid the crash. (Doc. 13, Ex. A at ¶ 28).

59. At the time of the crash the weather was clear and the ground was dry and in good condition. (Doc. 13, Ex. A at ¶ 29).

60. Mr. Linane performed an accident simulation in which he placed a 4' by 4' square board, painted across with orange lines every foot, at the location where Mr. Bales' lawn mower was on the road. (Tr. 60-61, 65-66, 105).

61. The lawn mower itself was just under four feet high, and Mr. Bales sitting on it would have added to the height. (Tr. 66).

62. Mr. Linane testified that he could see most of the board from 1100 feet away. (Tr. 61).

63. Mr. Linane's simulation is of limited use, because the board was brightly colored, while the lawn mower was gray; because the board was four feet wide at its top, the portion most visible at 1100 feet, while Mr. Bales on the lawn mower would have been narrower than four feet; and because the snow on the ground on the day of the reconstruction increased the color contrast between the board and the surroundings to a greater extent than the contrast seen in the spring between the gray mower and the surroundings. (Tr. 65-66; Ex. 3.1, 3.10, 3.17, 3.50; Ex. 18.6-18.11).

64. Though Mr. Linane's simulation is limited, the Court finds that, from 1100 feet, or 15 to 25 seconds before impact, Mr. Hilgemann was able to see Mr. Bales, though not as clearly as implied by Mr. Linane's testimony.

65. According to Mr. Linane's analysis of the skid marks on the road from Mr. Hilgemann's car, Mr. Hilgemann started braking 79 feet before impact with the lawn mower, which would have been two to three seconds before impact. (Tr. 49, 55-58).

66. Mr. Linane testified that Mr. Hilgemann could have either stopped or swerved to avoid the accident as close as 100 feet from the point of impact, depending on his speed. (Tr. 69).

67. Mr. Linane, using photographs taken by police of the crash site, identified two gouge marks on the road's pavement that were caused by attachment devices on the bottom of the lawn mower's mowing deck. (Tr. 37-38).

68. The attachment devices on the underside of the mower deck were six to eight inches apart, as were the gouge marks, and were equidistant from the center of the deck, which was 53.3 inches wide. (Tr. 36). The centerpoint of the gouge marks was 36 inches from the right edge of the road, indicating that the center of the mower was 36 inches from the right edge of the road. (Tr. 37-38). In making these observations, Mr. Linane relied on police photographs of the scene and the markings and measurements of the police report's scale drawing, rather than his own measurements, as the road was covered with ice when he went to observe the scene. (Tr. 36-37).

69. Mr. Linane used these markings and measurements to determine that the lawn mower was in the road, approximately one foot from the right edge of the road. (Tr. 130-31).

70. Mr. Hilgemann testified that he believed the lawn mower was about three feet into the road.[15] (Ex. 25 at 49).

71. The Court finds that Mr. Linane's markings and measurements regarding the gouge marks left on the pavement by the lawn mower deck are reliable.

---

[15] The Court's analysis is made more difficult by the fact that no party has defined what they mean when they say that the mower was one foot or three feet "into" the road. Does this indicate that the right edge was one or three feet from the right edge of the road, or that the center of the mower was this distance from the edge? Given the parties' lack of clarity on this point, the Court uses Mr. Linane's calculations from the physical evidence to draw its own conclusion as to the mower's placement.

72. Given the facts that the center of the mower deck was 36 inches from the right edge of the road, and that the mower deck was 53.3 inches wide, the Court finds that the mower deck's right edge was just over nine inches from the right edge of the road.[16]

73. The photos introduced into evidence show that that the lawn mower's deck is approximately the same width as the body of the mower, which is behind the deck and contains the seat. (Ex. 3, #50, 51; Ex. 18, #11). Therefore, the Court finds that the mower itself was completely on the road.

74. The Court finds that Mr. Hilgemann's testimony that the lawn mower was three feet into the road, to the extent it conflicts with the Court's finding based on the physical evidence, unreliable, as it conflicts with the measurements based on the gouge marks and with Mr. Hilgemann's testimony that he did not see the lawn mower until it was too late to avoid it. If the latter statement is true, then Mr. Hilgemann's impression of the mower's location was based on a split-second observation while he was attempting to swerve to avoid the mower and is less reliable than the measurements based on the gouge marks.

---

[16] Defendant argues that the 18-inch overlap of the mower's left rear and the car's right front measured by Mr. Linane indicates that the mower was more than one foot into the roadway. This road appears, from the photographs showing objects of different sizes on the road, to be at most 12-14 feet wide. (Ex. 3, #1-5, 43; Ex. 18, #11). If the mower's right edge was one foot from the right edge of the road, then the left edge of the mower was almost five and a half feet from the edge; if the mower's right edge was nine inches from the right edge of the road, which the Court finds that it was, the mower's left edge would have been just under five feet from the edge of the road. If the center of Mr. Hilgemann's car was in the center of the road, it would have extended a few feet to each side of the center, overlapping at least eighteen inches with the mower, even if the right edge of the mower was only nine inches from the edge of the road.

75. Randy testified that the lawn mower could have been driven on the grassy shoulder, rather than on the road. (Tr. 185).

76. Mr. Linane testified that the accident probably would not have occurred if Mr. Bales had had the mower's wheels off of the road. (Tr. 132).

77. Mr. Linane testified that the mower was a motor vehicle, categorized as "special mobile equipment" under Illinois law, and was allowed to be on the road for incidental uses. "Special mobile equipment" need not be registered for operation on the roads. (Tr. 71-74, 76-77, 107-09). Defendant contends that the mower does not qualify as "special mobile equipment," and was also not "incidentally" on the road. Defendant argues that this violation of Illinois law constitutues prima facie evidence of negligence on Mr. Bales' part, and that the mower was not legally on the road; if the mower had not been on the road, the accident would not have occurred.

78. The Court finds that it was negligent for Mr. Bales to drive the mower on the road, where it was possible to drive the mower on the grassy shoulder, whether or not it was permissible to drive it on the road for incidental uses and whether or not the mower should have been registered. This negligence causally contributed to the accident.

79. At the time of the crash, the lawn tractor Mr. Bales was driving did not have a triangular slow moving vehicle sign affixed to the rear of the vehicle. (Doc. 13, Ex. A at ¶ 19).

80. Mr. Linane testified that Mr. Bales was required to have a slow moving vehicle sign on the back of the lawn mower, and that the purpose of the slow moving

vehicle sign is to increase visibility and to indicate that the vehicle is slow-moving. (Tr. 93, 118, 138).

81. Though Mr. Bales should have had a slow-moving vehicle sign on the mower under Illinois law, it would not have made a difference, as Mr. Hilgemann testified that he did not see the mower until it was too late, not that he thought the mower was moving faster than it was. Therefore, Mr. Bales' violation of the Illinois vehicle code by not having a slow-moving vehicle sign did not contribute to causing the accident.

82. In the same way, whether or not Mr. Bales was required to have amber signal lamps on the mower is irrelevant, as they have to be seen in order to be useful.[17]

83. Radio headphones were found at the scene of the accident. Mr. Linane's report concluded that Mr. Bales was wearing them at the time of the accident, though Mr. Linane testified that this conclusion was based on his own conjecture. (Tr. 95-96, 120). Randy Bales, though, testified that his father was wearing the headphones at the time of the accident, as he typically wore them to listen to the radio while mowing. (Tr. 184-85). Mr. Linane's report indicated that he was not able to determine whether Mr. Bales' wearing of the headphones would have prevented his hearing vehicles approaching from behind. (Tr. 96, 120, 137).

---

[17] If the weather had been inclement on the day of the accident, the Court may have come to a different conclusion about the amber signal lamps, as, if on, they may have increased Mr. Bales' visibility to Mr. Hilgemann. A light on a cloudy or overcast day is more eye-catching than a light on a sunny day. As the day was clear, though, they would not have increased visibility any more than would have a sign. (Doc. 13, Ex. A at ¶ 29).

84. The Court finds that Mr. Bales was more likely than not wearing radio headphones at the time of the crash, which is prohibited when operating a motor vehicle on highways under Illinois law. Though Mr. Bales was wearing headphones in violation of Illinois law, which is prima facie evidence of negligence on his part, the Court does not find that Defendant has proven that this violation contributed causally to the accident, as the sound of the mower may have obscured the sound of a car approaching from behind. Even if Mr. Bales had not been wearing headphones, whether or not they were operating at the time of the crash, he could not have heard the car approaching in time to get off of the road.

85. The lawn mower was not equipped with rearview mirrors, which is required for motor vehicle operation on the roads under the Illinois vehicle code. (Tr. 123-24, 185).

86. The Court finds that Mr. Bales' violation of the mirror requirement was a causal contributor to the accident, as it is more likely than not that Mr. Bales would have been able to see the approach of Mr. Hilgemann's vehicle and moved the lawn mower off the road in time to avoid the accident if they had been installed.

87. The Court finds that Mr. Hilgemann was primarily at fault in the accident, as admitted by Defendant, as he could have easily avoided the accident at many points during which he could certainly see the mower.

88. The Court also finds that Mr. Bales was negligent in driving on the road with the mower when he could easily have driven the mower on the grassy shoulder or shallow ditch alongside the road, and that he was negligent in driving the lawn

mower on the road without installing rearview mirrors, in violation of Illinois law.

89. Mr. Bales' negligence contributed 20% to the accident.

## ORDER

For the foregoing reasons, the Court finds that Defendant is liable to Plaintiff in the amount of $2,814,943.39, which includes $1,750,000 for the loss of Mr. Bales' society and services to Mrs. Bales, $500,000 for the loss of Mr. Bales' society and services to Donna Bales, $500,000 for the loss of Mr. Bales' society and services to Randy Bales, and $64,943.39 in medical expenses to be recovered by Mr. Bales' estate. The Court finds that damages shall be reduced by 20%, the amount of Mr. Bales' negligence that contributed to the accident. Therefore, the Clerk is directed to enter judgment for Plaintiff and against Defendant in the amount of $2,251,954.71.

CASE TERMINATED.

Entered this 21st day of May, 2010.

s/ Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge